**In re SEATRAIN LINES, INC., Debtor.**

**SCOTTSDALE ASSOCIATES, INC., Plaintiff,**

v.

**SEATRAIN LINES, INC., Debtor in Possession, Defendant.**

**Bankruptcy No. 81 B 10311.**
**Adv. No. 81–5556–A.**

United States Bankruptcy Court, S. D. New York.

June 4, 1982.

Ravin & Kesselhaut, West Orange, N. J., for plaintiff.

Stroock & Stroock & Lavan, New York City, for defendant.

Fried, Frank, Harris, Shriver & Jacobson, New York City, for Creditors' Committee.

Burns, Jackson, Summit, Rovins & Spitzer, New York City, for Committee of Debentureholders.

Weil, Gotshal & Manges, New York City, for AEA Fuel Systems, Inc.

DECISION ON SCOTTSDALE ASSOCIATES, INC.'s COMPLAINT SEEKING TERMINATION OF THE AUTOMATIC STAY AND TERMINATION OF AN ALLEGED LEASE WITH DEBTOR AND TERMINATION OF DEBTOR'S OPTION TO REPURCHASE PREMISES

EDWARD J. RYAN, Bankruptcy Judge.

On February 11, 1981, a petition under Chapter 11 of the Bankruptcy Code, was filed against Seatrain Lines, Inc. ("Seatrain"). On that date an order for relief was granted on Seatrain's consent. Seatrain has continued in possession of its property and is now operating its business as a debtor in possession.

The instant action is an adversary proceeding commenced by Scottsdale Associ-

ates, Inc. ("Scottsdale") * for an order lifting or modifying the automatic stay and terminating the lease between Scottsdale and Seatrain, and terminating Seatrain's option to purchase the leased premises.

The property at issue is a twelve-acre parcel of land in Weehawken, New Jersey, owned by Jackson Tanker Corporation ("Jackson"). Jackson is a wholly owned subsidiary of Seatrain. Jackson acquired title to the property in July, 1976. The major improvement on the property is a warehouse. Seatrain believed that construction of a warehouse on said property would result in a cost efficient container operation.

After Jackson purchased the property in 1976, Seatrain sought bids from architects and retained an architect to draw up plans and specifications for the warehouse. Thereafter, Seatrain sought bids from at least six contractors for the construction of the warehouse. One of the requirements of the bid package was that the contractor obtain the financing to build the warehouse. Attempts to obtain financing directly by Seatrain had been unsuccessful because Seatrain was considered a classified credit risk.

The contractor who was ultimately retained by Seatrain, Erickson Construction Company, introduced Seatrain to Phoenix Associates, Inc. ("Phoenix"), and stated that Phoenix could procure financing for Seatrain.

Phoenix made several unsuccessful efforts to obtain financing for Seatrain and eventually put Seatrain in contact with Globe Mortgage Company ("Globe") in New Jersey. A deal was reached with Globe and papers embodying that transaction were prepared.

Raymond DeMilia, the president of Phoenix, was present at the negotiations in which an agreement was reached with Globe. After execution of the agreement with Globe, however, Globe failed to advance the funds required. At that time Phoenix agreed that it would execute the same documents that had been prepared for Globe and the transaction was closed with Phoenix in July, 1977.

Pursuant to the July, 1977 transaction with Phoenix, Jackson leased the twelve-acre parcel to Phoenix pursuant to a lease agreement dated July 18, 1977 (the "Prime Lease"). Simultaneously with the Prime Lease from Jackson to Phoenix, Phoenix entered into a sublease with Seatrain (the "Sublease") and also an agreement providing Seatrain with the option to purchase the property.

Section 2 of the Prime Lease between Jackson and Phoenix provided for a lease term of 50 years. Section 3 of the Prime Lease provided for an annual rent of $10 to be paid during each year of the 50 years. Section 44 of the Prime Lease provided that in the event Seatrain exercised its purchase option with respect to the property, then the Prime Lease was to terminate.

Section 15 of the Sublease between Phoenix and Seatrain obligated Phoenix to construct the warehouse designed by Seatrain for an amount not to exceed $1,120,000. The Sublease was to terminate automatically if Phoenix failed to commence construction by July 25, 1977. Section 4 of the Sublease provided that the basic rent during the first five years of the term was to be $145,600 per year. This is exactly 13% of $1,120,000. Section 15 of the Sublease further provided that in the event the total cost of construction exceeded $1,120,000 and Phoenix paid such additional amount, then the basic rent was to be increased by an amount equal to 13% of such increased cost.

Section 4 and Schedule B of the Purchase Option Agreement dated July 18, 1977 between Phoenix and Seatrain entitled Seatrain to purchase Phoenix's right, title and interest to the property in the tenth year of the Sublease for the amount of $1,120,000. Schedule B also provided that if the option were exercised during the first nine years of the Sublease, then the option price payable was to be $1,420,000.

* Scottsdale is a New Jersey corporation formerly known as Phoenix Associates, Inc.

Aron Pick, Associate General Counsel for Seatrain, was involved in the negotiations with Globe and Phoenix leading up to the execution of the July, 1977 agreements, which agreements he also drafted. According to Mr. Pick's testimony, the negotiations between Seatrain, Globe and Phoenix contemplated that Seatrain would repurchase the property for the construction costs to be advanced, which were to be $1,120,000 after paying interest on that amount for ten years at an initial rate of 13% for five years and 13.3% for the second five years. It was also negotiated that if Seatrain determined to exercise the option prior to the tenth year, then it would have to pay as liquidated damages or penalty an additional $300,000.

Phoenix had no involvement in the planning or design of the warehouse. The warehouse was planned by Seatrain, who selected and supervised the architect that designed the warehouse. Phoenix also had no involvement in selecting the general contractor who constructed the warehouse. The general contractor, Erickson Construction Company, was selected solely by Seatrain.

A cost overrun did occur in the construction of the warehouse. That amount in excess of $1,120,000 was paid directly by Seatrain to the contractor and had no effect on the rent or purchase option amount.

At the trial, on December 21, 1981, Aron Pick testified that he never considered the transaction to be a true landlord-tenant relationship but purely a financing transaction. According to Pick, the transaction was structured as a lease and lease-back because Seatrain was a classified credit risk and was unable to obtain the financing necessary to construct the warehouse by itself. Initially Globe, and later Phoenix, agreed to provide the financing if the return available to them could be increased beyond a pure interest rate of return by obtaining certain tax benefits from structuring the transaction as a lease and lease-back.

In December, 1977 after the completion of construction, Scottsdale obtained permanent financing from General Electric Credit Corporation ("GECC"). Aron Pick was present at the closing between GECC and Scottsdale. At that time he saw Scottsdale deliver to GECC a collateral assignment of all the Scottsdale interest in and to the Sublease between Phoenix and Seatrain dated July 18, 1977. The collateral assignment from Scottsdale to GECC was signed by Raymond DeMilia on behalf of Scottsdale. In the assignment Scottsdale not only assigned its interest in and to the Sublease but also all rents, income and profits arising from the Sublease. Scottsdale further warranted that it would not alter, modify or change the terms of the Sublease or cancel or terminate the Sublease.

According to Aron Pick's uncontroverted testimony, Seatrain, until it first defaulted in the payments required by the Sublease, made all rental payments directly to GECC.[1] Additionally, the taxes on the premises were paid by Seatrain or Jackson directly to the tax authorities.[2] Seatrain had purchased and paid for the insurance on the property which is current at this time, and has continually provided security for the property. Neither Scottsdale nor Phoenix has ever supplied any services to Seatrain other than the financing of the warehouse.

In order to exercise its purchase option under the July 18, 1977 option agreement, Seatrain must pay approximately $1,520,000.[3] Scottsdale's appraiser has placed a fair market value of $1,600,000 on the property. Scottsdale itself has no use for the

---

1. As of the date of trial, Seatrain owed $169,986.62 on the warehouse. The monthly payments due GECC accrue at the rate of approximately $12,000 per month.

2. Seatrain owed taxes on the property from the third quarter of 1980 in the amount, including interest, of $111,985.46. Monthly taxes accrue at the rate of approximately $7,000 per month.

3. This is the amount quoted by Morton Dear, one of Scottsdale's two witnesses at the trial.

property.[4] In addition, Scottsdale has never received consent, under the collateral assignment of the Sublease, from GECC to terminate the Seatrain Sublease. In any event, the only firm offer Scottsdale ever had for the purchase of its interest in the property was an offer from Potamkin Cadillac to purchase the entire property for $1,460,000. However, prior to the commencement of the trial Potamkin had informed Scottsdale that it must obtain possession of the premises before the end of 1981. In its application for approval of the Potamkin sale, Scottsdale represented to the court that Potamkin had to acquire title to the property prior to December 1, 1981.

Such time has elapsed and, to date, Scottsdale has not presented the court with any written contract it may have with Potamkin with respect to the sale of the property.

Since the commencement of Seatrain's Chapter 11 proceedings, it has received two offers for the purchase of the property. The first offer was from the Port Authority of Weehawken for the amount of $3,000,000. The second offer is from AEA Fuel Ownership, Inc. ("AEA") for the amount of $1,650,000. Section 4 of the agreement with AEA provides for the closing of the sale to occur within 120 days from court approval of the agreement.[5]

Scottsdale's only two witnesses to testify at the trial were Messrs. Morton Dear and Alan Turtletaub, both officers of The Money Store, the finance company that advanced the interim construction financing to Scottsdale. However, Messrs. Dear and Turtletaub, who are also associated with Scottsdale, were not associated with Scottsdale until July, 1978, a time after the transaction between Jackson, Seatrain and Phoenix closed. In addition, uncontroverted testimony at trial indicated that Phoenix was never incorporated until August 1977, a date after the closing of the transaction between Jackson, Seatrain and Phoenix.

These irregularities further support Seatrain's claim that the transaction between the parties was one of an equitable mortgage and not of landlord-tenant.

Based upon the uncontroverted testimony at the trial by an individual intimately involved with the negotiation and drafting of the agreements at issue herein and based upon other documentary evidence, this court denies the relief requested by Scottsdale. Scottsdale, in commencing this adversary proceeding, sought, *inter alia*, relief from the automatic stay.[6] Section 362 of the Code provides protection from a debtor's interest in its property and other assets by allowing the Petition for Reorganization to operate as a stay of proceedings against the debtor's estate. The dissolution of such a stay will be effected only in limited circumstances upon an adequate showing by a creditor, 11 U.S.C. § 362(d–f). A creditor must show either lack of adequate protection or lack of debtor equity in the property in question. In the present case, Scottsdale put into issue Seatrain's equity in the New Jersey property. This court denies the relief requested by Scottsdale because it finds that the debtor does, in fact, have an equity interest in the New Jersey property in that the relationship between Scottsdale and Seatrain is one of equitable mortgagee-mortgagor, not lessor-lessee.

The Prime Lease from Jackson to Phoenix and the Sublease back from Phoenix to Jackson's parent, Seatrain, coupled with Seatrain's purchase option constituted a single transaction in the nature of an equitable mortgage.

New Jersey law recognizes the financing device of a leasehold mortgage as well as a mortgage on a fee simple. The lease and lease-back transaction that is the subject of this action is simply the equitable equivalent of a leasehold mortgage, just as a sale and lease-back is the equitable equivalent of ordinary mortgage. N.J.Stat.Ann. 17:9A–66 West (1963).

**4.** GECC has commenced a foreclosure action in New Jersey with respect to the property.

**5.** The agreement with AEA was approved by this court on January 15, 1982.

**6.** 11 U.S.C. § 362.

At the time Seatrain entered into the July 18, 1977 transaction with Phoenix it already had indirect ownership, through its subsidiary Jackson, of the property and had retained an architect to design a warehouse, and a contractor to construct the warehouse. Seatrain at that time was having difficulty obtaining financing for the warehouse project. The only discernable purpose, supported by the evidence, for Seatrain's engaging in negotiations with Phoenix was for the purpose of obtaining financing for the construction of the warehouse.

Under the terms of the Prime Lease, Sublease and purchase option, Jackson leased the property to Phoenix for a nominal amount and Phoenix undertook to construct a warehouse on the property at a cost not to exceed $1,120,000. Simultaneously, Phoenix leased back the land and warehouse to Seatrain. The rent negotiated by the parties and provided for in the Sublease was equivalent to a 13% return on the principal amount of $1,120,000 that was advanced by Phoenix for the construction of the warehouse. Furthermore, the purchase option entitled Seatrain to reacquire the land and warehouse for the principal amount of $1,120,000 after the payment of interest on that amount for five years at 13% and a second five years at 13.3%. The amount of the rent and the purchase option appear to have been fixed without reference to the market value of the property.

Seatrain agreed to the lease and leaseback device as a means of financing construction of the warehouse because Seatrain was a classified credit risk unable to obtain financing on its own. Neither Phoenix nor Scottsdale appears to have ever provided any of the services customarily provided by a landlord other than the provision of financing for the construction of warehouse.

■ The Prime Lease of the property by Jackson to Phoenix for 50 years for a nominal rent of $50 per year was, in effect, the transfer of the property without the fixing of a purchase price. This is one of the hallmarks of an equitable mortgage transaction. *Mansfield v. Hammond*, 117 N.J.Eq. 509, 176 A. 354 (E & A 1935).

The fact that Seatrain retained the right to use and enjoy the property despite the lease from Jackson to Phoenix and the further fact that Seatrain possessed the right to redeem the property from Phoenix by the payment of the amount Phoenix had advanced for the construction of the warehouse, are further hallmarks of an equitable mortgage. *White v. Megill*, 18 A. 355 (N.J. Ch.1889).

■ The fact that the amount of the purchase option was unrelated to the market value of the property and was equivalent to the amount advanced by Phoenix for Seatrain's benefit also is strong evidence that the transaction was intended for security.

■ Based upon the foregoing, the transaction in question is an equitable mortgage and Scottsdale's right as mortgagee is solely the right to commence proceedings in order to foreclose Seatrain's equity of redemption. Scottsdale is not entitled to deprive Seatrain of that right of redemption summarily by the purported termination of the Sublease and purchase option.

Seatrain has entered into an agreement with AEA Fuel Ownership, Inc., providing for the possible purchase of the property for the amount of $1,650,000. Foreclosure by Scottsdale at this time would jeopardize Seatrain's right to obtain that purchase price.[7]

Scottsdale itself has valued the property at $1,600,000. The total amount that must be paid by Scottsdale to prevent foreclosure of its interest in the property is approxi-

---

**7.** Scottsdale's testimony relating to the Potamkin offer suggests that that offer is highly tenuous and may in fact no longer even exist. No evidence was presented to establish that the offer was in fact still outstanding, and the December 1 and January 1 deadlines previously represented to the Court for the completion of the transaction have since passed. Even Scottsdale's witnesses have conceded that Potamkin representatives have informed them that Potamkin on the date of the trial may already have signed an agreement to acquire a different parcel of property.

mately $1,311,000. Thus there is an equity in the property of approximately $289,000. Even if the property were foreclosed, Scottsdale has presented no evidence that it would suffer any out-of-pocket loss, because it appears that Scottsdale financed the construction of the warehouse with funds borrowed from GECC.

Assuming that Scottsdale is entitled to the liquidated damages provided by the purchase option agreement because of Seatrain's exercise of the option to purchase prior to the tenth year of the Sublease, the present option price is $1,520,000, an amount at least $80,000 less than Scottsdale's own estimate of the fair market value of the property.

For the foregoing reasons, Scottsdale is not entitled to relief from the automatic stay.

Settle an appropriate order.