In re UAL CORPORATION,
et al., Debtors.

United Air Lines, Inc., Plaintiff,

v.

HSC Bank USA, as trustee, the California Statewide Communities Development Authority, the City and County of San Francisco, and the Airports Commission for the City and County of San Francisco, Defendants.

United Air Lines, Inc., Plaintiff,

v.

The Bank of New York, Inc., as trustee, the Port Authority of New York and New Jersey, and the New York City Industrial Development Agency, Defendants.

United Air Lines, Inc., Plaintiff,

v.

U.S. Bank N.A., as trustee, the Regional Airports Improvement Corporation, and the City of Los Angeles, Defendants.

United Air Lines, Inc., Plaintiff,

v.

HSC Bank USA, as paying agent, and the City and County of Denver, Defendants.

Bankruptcy No. 02 B 48191.
Adversary Nos. 03 A 00975, 03 A 00976, 03 A 00977, 03 A 00978.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

March 30, 2004.

James H.M. Sprayregen, Marc Kieselstein, David R. Seligman, Todd Gale, Kirkland & Ellis, Chicago, IL, for Debtors.

Ronald Barliant, Andrew Weissman, Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Ltd., Chicago, IL; and Katherine A. Constantine, Steven J. Heim, Dorsey & Whitney, LLP, Minneapolis, MN; Mark J. Prager, Jill L. Murch, Foley & Lardner, Chicago, IL, for U.S. Bank National Association.

R. Dale Ginter, Sallie B. Armstrong, Jenna L. Clark, Downey Brand LLP, Sacramento, CA, for California Statewide Communities Development Authority.

Paul E. Chronis, Kristin L. Cantu, Hannah J. Mufson, Nathan F. Coco, McDermott, Will & Emery, Chicago, IL, for JFK.

Charles P. Schulman, Arlene Gelman, Sachnoff & Weaver, Ltd, Chicago, IL; John J. Bingham, Jr., Aaron E. DeLeest, David A. Gill, Danning, Gill, Diamond & Kollitz, LLP, Los Angeles, CA; Steven J. Heim, Patrick J. McLaughlin, Katharine A. Constantine, Dorsey & Whitney, LLP, Minneapolis, MN, for LAX and City of Los Angeles.

David A. Golin, Gesas, Pilati, Gesas & Golin, Ltd., Chicago, IL; Rockard J. Delgadillo, Eduardo Angeles, John M. Werlich, Office of the Los Angeles City Attorney, Los Angeles, CA, for The Regional Airports Improvement Corp.

William W. Kannel, Timothy J. Langella, George Hofman, Mintz, Levin, Cohen, Ferris, Glovsky & Popeo, PC, Boston, MA; Douglas W. Jessop, Kerstin Cass, Jessop & Company, P.C., Andrew M. Schauer, Krys Boyle, P.C., Denver, CO, for Denver Airport.

Gary W. Garner, Harold Kaplan, Mark F. Hebbeln, Stephanie Wickouski, Gardner, Carton & Douglas, Chicago, IL, for Denver City and County of Denver and SFO.

Jason E. Rios, Dale R. Ginter, Downey Brand, LLP, Sacramento, CA, for California Statewide Communities.

Kirk Dillman, Michael Morris, Josh Mester, Hennigan, Bennett & Dorman, LLP, Los Angeles, CA, for HSBC Bank.

## MEMORANDUM OF DECISION

EUGENE R. WEDOFF, Chief Judge.

Four related adversary proceedings are before the court in these jointly administered cases. In each of the proceedings, one of the debtors, United Air Lines, Inc. ("United"), seeks a declaratory judgment that certain of its payment obligations related to airport improvements are not obligations arising under "leases" pursuant to § 365 of the Bankruptcy Code (Title 11 U.S.C., the "Code"). The defendants in the proceedings are other parties to the instruments giving rise to the payment obligations. The defendants have all asserted that these instruments are in fact "leases" under § 365. Both United and the defendants seek summary judgment. As discussed below, a "lease" under § 365 must be a "true" lease, as opposed to a financing instrument. Because this is not the situation in three of the four adversary proceedings, United is entitled to summary judgment in those proceedings. In the fourth proceeding, involving the Denver airport, a true lease is involved, and the defendants are entitled to judgment.

### Jurisdiction

Federal district courts have exclusive jurisdiction over bankruptcy cases. 28 U.S.C. § 1334(a). Pursuant to 28 U.S.C. § 157(a), district courts may refer bankruptcy cases to the bankruptcy judges for their district, and, by Internal Operating Procedure 15(a), the District Court for the Northern District of Illinois has referred the pending cases. When presiding over a referred case, a bankruptcy judge has jurisdiction under 28 U.S.C. § 157(b)(1) to enter appropriate orders and judgments in core proceedings within the case. The pending adversary proceedings are core proceedings under 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate), § 157(b)(2)(B) (allowance or disallowance of claims against the estate), § 157(b)(2)(M) (orders approving the use or lease of property), and § 157(b)(2)(O) ("other proceedings affecting ... the adjustment of the debtor-creditor or equity security holder relationship"). *See In re PCH Assocs.,* 60 B.R. 870, 872–73 (S.D.N.Y.), *aff'd,* 804 F.2d 193

(2d Cir.1986) (declaratory judgment action to determine the "lease" status of an agreement is a core proceeding). This court therefore has jurisdiction to enter final orders with respect to the pending proceedings.

## Undisputed Facts

The four adversary proceedings that produced the present motions all involve a similar situation: tax-exempt bonds were issued to finance the construction of airport improvements for the benefit of United, and the debt service on the bonds was to be paid with funds received from United. The parties dispute the effect in bankruptcy of the documents giving rise to United's payment obligations, but there is no dispute about the identity or content of these documents.

*1. San Francisco International Airport (SFO)—Adversary Proceeding No. 03 A 00975.* At the San Francisco International Airport, United entered into a Ground Lease with the City and County of San Francisco, administered by their Airports Commission, on June 18, 1973 (the "SFO Ground Lease"). United was to use the leased land for "construction and operation of aircraft maintenance hangar, test and storage facilities" and for administrative and supervisory operations, rather than for loading and unloading commercial passengers and cargo. (SFO Ground Lease at 4–5.) The lease had an initial term of 20 years and was subject to two ten-year extensions at the option of United. (*Id.* at 7.) Thus, the lease would expire no later than 2113.

Some 24 years after the Ground Lease was executed, United, the California Statewide Communities Development Authority (a governmental agency authorized to issue bonds, the "CSCDA"), and an indenture trustee (now HSC Bank USA, the "SFO trustee") entered into four interrelated agreements, all dated August 1, 1997, in order to finance a number of improvements in United's facilities at the airport. The agreements included (1) a Site Sublease (the "SFO Sublease"), (2) a Facilities Lease (the "SFO Leaseback"), (3) an Indenture of Mortgage and Deed of Trust (the "SFO Indenture"), and (4) a Guaranty Agreement.

● *The SFO Sublease.* Pursuant to the SFO Sublease, United leased to the CSCDA a portion of the property covered by the SFO Ground Lease. (SFO Sublease at 2 and Exhibit A.) The term of the SFO Sublease is defined as the period from September 1, 1997 to October 5, 2033, unless a shorter or longer period (ending no later than October 5, 2038) is required to retire bonds to be issued by the CSCDA (with the parties expressly recognizing that the SFO Ground Lease might expire before the expiration of the SFO Sublease). (*Id.* at 2.) The rent that the CSCDA was required to pay United for the entire term of the sublease was $1, and there is no provision for remedies on the part of United for any default by the CSCDA. (*Id.*)

● *The SFO Leaseback.* Under the SFO Leaseback, the CSCDA leased back to United the identical property leased to it in the SFO Sublease. (SFO Leaseback at 2.)[1] The term of the SFO Leaseback is

---

**1.** To see that the identical property is involved requires some effort. The SFO Leaseback defines its "Leased Facilities" as they are defined in the SFO Indenture. The SFO Indenture, in turn, defines "Leased Facilities" as the "Demised Premises and the improvements to be acquired, constructed ... and

installed thereon or therein." (SFO Indenture at 9.) The Indenture defines "Demised Premises" as the real property described in Exhibit A to the Indenture. (SFO Indenture at 6.) Exhibit A to the SFO Indenture is identical to Exhibit A to the SFO Sublease, which defines the property leased in that instrument.

also identical to the term of the SFO Sublease. (*Id.* at 3.) However, the rent United agreed to pay for leasing back the property that it subleased to the CSCDA is defined by the amounts necessary to make payments on the bonds to be issued under the SFO Indenture, together with the costs of administering the financing. (*Id.* at 3–4.) [2] The SFO Leaseback provides a full set of default provisions and remedies, including the CSCDA's right to take possession of the leased facilities and relet them if United fails to make the required payments. (*Id.* at 16–19.)

● *The SFO Indenture.* The SFO Indenture generally provides (a) for the issuance of tax-exempt bonds by the CSCDA (SFO Indenture at 15, 37), (b) for the SFO trustee to receive the proceeds of the sale of the bonds for purposes of funding construction of defined improvements benefiting United (*id.* at 20–22), and (c) for the SFO trustee to receive the rental payments from United under the SFO Leaseback for the purpose of paying the debt service on the bonds and ultimately retiring them (*id.* at 29–33). The SFO Indenture makes clear that the bonds are "limited obligations" of the CSCDA, payable only from revenue received from United and earnings on this revenue. (*Id.* at 15.)

● *Guaranty Agreement.* The Guaranty Agreement sets out a guaranty from United to the SFO trustee of all payments due under the bonds.

**2. JFK International Airport (JFK)—Adversary Proceeding No. 03 A 00976.** At JFK International Airport in New York, United leases land from the Port Authority of New York and New Jersey (the "Port Authority") under an Agreement of Lease (the "JFK Ground

Lease") dated August 1, 1995. The Port Authority's rights in the property derive from an "Agreement with respect to Municipal Air Terminals" between the Port Authority and the City of New York, dated April 17, 1947. The JFK Ground Lease involves premises consisting of two adjacent areas. (JFK Ground Lease at 2 and Exhibit A.) United was required to surrender one of the areas (Area II—referred to as Area 2 in the Exhibit and later agreements) no later than July 31, 1999. The lease on the other area (Area I—referred to as Area 1 in the Exhibit and later agreements) has an initial term expiring on December 30, 2015, subject to extension to July 31, 2024 if the Port Authority procures an extension of its lease with the City of New York. (*Id.* at 3.)

Within two years of the execution of the JFK Ground Lease, United, the Port Authority, the New York City Industrial Development Authority (a governmental agency authorized to issue bonds, the "NYCIDA"), and an indenture trustee (now the Bank of New York, Inc., the "JFK trustee") entered into a series of agreements to finance construction of a United cargo handling and warehousing facility and a ground service equipment facility at the airport. These agreements—all but the first of which are dated July 1, 1997—include (1) a Company Sublease Agreement, dated January 1, 1997 (the "JFK Sublease"), (2) a Lease Agreement (the "JFK Leaseback"), (3) a Consent to Subleases Agreement (the "Consent Agreement"), (4) an Indenture of Trust (the "JFK Indenture"), (5) a First Supplemental Indenture of Trust (the "JFK Supplemental Indenture"), and (6) a Guaranty Agreement.

---

2. The SFO Leaseback requires United to pay as additional rent "Administrative Fees and Expenses." (SFO Leaseback at 4.) The SFO Indenture defines this term as "any adminis-

trative or other expenses incurred by the [CSCDA] or the Trustee" in connection with the SFO Sublease, Leaseback, or Indenture. (SFO Indenture at 5.)

● *The JFK Sublease.* Pursuant to the JFK Sublease, United leased to the NYCIDA the "Facility Realty," consisting of Area 1 of the JFK Ground Lease. (JFK Sublease at 2, Indenture at 9.)[3] The term of the sublease has several variables, but will extend no longer than the maturity date of the bonds to be issued under the JFK Indenture (October 1, 2032). (*Id.*) The sublease also terminates with the expiration or earlier termination of the JFK Leaseback or the JFK Ground Lease. (*Id.* at 2–3.) The rental to be paid by the NYCIDA to United for the entire term of the sublease is $10, and there is no provision for remedies on the part of United for any default by the NYCIDA. (*Id.* at 4.)

● *The JFK Leaseback.* Under the JFK Leaseback, the NYCIDA leased back to United the identical property leased to it in the JFK Sublease. (JFK Leaseback at 15.) The term of the JFK Leaseback is also substantially identical to the term of the JFK Sublease. (*Id.* at 15–16.) However, the rent United pays for leasing back the property that it subleased to the NYCIDA is defined by the amounts necessary to make payments on the bonds to be issued under the JFK Indenture. (*Id.* at 17–18.)[4] The JFK Leaseback provides a set of default provisions and remedies, including the right on behalf of the NYCIDA (with the consent of the JFK trustee) to terminate United's interests in the subleased property if United fails to make the required payments, but not including a right to take possession of the leased facilities and relet them. (*Id.* at 39–43.)

● *The Consent Agreement.* In the Consent Agreement, the Port Authority consented to the JFK Sublease and Leaseback, with the proviso that "[t]he Subleases and the financing transaction of which the Subleases are a part ... are expressly and in all respects subject and subordinate to ... all of the terms ... of the [JFK Ground Lease]." (Consent Agreement at 2–3.)

● *The JFK Indenture and Supplemental Indenture.* The JFK Indenture and Supplemental Indenture generally provide (a) for the issuance of tax-exempt bonds by the NYCIDA (JFK Indenture at 22–32, JFK Supplemental Indenture at 1–13, 15–16), (b) for the JFK trustee to receive the proceeds of the sale of the bonds for purposes of funding construction of defined improvements benefiting United (JFK Indenture at 33–35, JFK Supplemental Indenture at 20–21), and (c) for the JFK trustee to receive the rental payments from United under the JFK Leaseback for the purpose of paying the debt service on the bonds and ultimately redeeming them (JFK Indenture at 35–42). The Indenture makes clear that the bonds are "limited obligations" of the NYCIDA, payable only from revenue received from United and earnings on this revenue. (JFK Indenture at 27–28, JFK Supplemental Indenture at 3.)

● *The Guaranty Agreement.* The Guaranty Agreement sets out a guaranty from

---

**3.** The JFK Sublease does not itself define the "Facility Realty" involved, but it does incorporate definitions of capitalized terms from the JFK Indenture. (JFK Sublease at 1). The Indenture, in turn, defines "Facility Realty" as the land described in its appendices (JFK Indenture at 9), and Appendix A to the Indenture describes the Facility Realty as Area 1 of the JFK Ground Lease, using the same drawing as in Exhibit A to the Ground Lease.

**4.** The JFK Indenture (at 59) provides for United to pay the expenses of administering the Indenture "as provided in the [JFK Leaseback]," but the JFK Leaseback itself does not appear to provide for such payment. This may be an inadvertent omission, since the JFK Leaseback (at 17) makes reference to payment of rent in a § 3.5 but does not actually include such a section.

United to the JFK trustee of all payments due under the bonds.

3. *Los Angeles International Airport (LAX)—Adversary Proceeding No. 03 A 00977.* United conducts terminal operations at Los Angeles International Airport (LAX) on property rented from the City of Los Angeles pursuant to a Terminal Facilities Lease (the "LAX Ground Lease") dated June 4, 1981. This lease anticipated that United would construct expanded terminal facilities with financing possibly provided by or through the Regional Airports Improvement Corporation, a governmental agency authorized to issue bonds (the "RAIC"). (LAX Ground Lease at 2, 13, 72.) The term of the lease, as amended, was to commence November 15, 1981 (or later, in the event of delayed City Council approval) and was to extend for 40 years, subject to earlier termination at the time of the expiration of any long term tax-exempt bond financing. (LAX Ground Lease at 15.) On November 15, 1982, United, the City of Los Angeles, the RAIC, and an indenture trustee entered into a series of agreements to effectuate the anticipated financing, including: (1) a Partial Assignment of Terminal Facilities Lease (the "LAX Assignment"), (2) a Facilities Sublease (the "LAX Leaseback"), (3) a Contingent Lease Agreement, (4) an Indenture of Mortgage and Deed of Trust (the "LAX Indenture"), (5) a First Supplemental Indenture of Mortgage and Deed of Trust (the "LAX Supplemental Indenture"), and (6) a Guaranty Agreement.

· *The LAX Assignment.* In the LAX Assignment, United assigned to the RAIC all of United's right and interest in the LAX Ground Lease "as it relates and applies to the RAIC Facilities"—the facilities that would be constructed with the financing to be obtained through the RAIC. (LAX Assignment at 2 and Exhibit A.) The only consideration stated for this assignment is "the agreements and undertakings by the parties hereto." (*Id.* at 2.) The LAX Assignment terminates upon termination of the LAX Leaseback. (*Id.*)

● *The LAX Leaseback.* In the LAX Leaseback, the RAIC leased back to United the right and interest in the RAIC Facilities that the RAIC received through the LAX Assignment. (LAX Leaseback at 1–2, 5.) The term of the LAX Leaseback commenced on November 15, 1982 and extends "until payment or redemption of the Bonds" to be issued under the LAX Indenture and Supplemental Indenture. (*Id.* at 3.) The rent to be paid by United for leasing back the right and interest that it assigned to the RAIC is defined as the amounts necessary to make payments on the bonds to be issued under the LAX Indenture together with RAIC's expenses of administering the financing project. (*Id.* at 4–5.) The LAX Leaseback contains a full set of default and remedy provisions, including an authorization for the RAIC to remove United from the RAIC Facilities in the event of default and to "make efforts to relet the RAIC Facilities." (*Id.* at 19–23.)

● *The Contingent Lease Agreement.* The Contingent Lease Agreement effectuated the RAIC's rights in the event of a default by United under the LAX Leaseback. The agreement provides that, in the event that United's rights under the LAX Leaseback are terminated because of United's default, the City of Los Angeles will grant the RAIC a 90–day option to enter into a new Ground Lease, on the same terms offered to United, for the balance of the remaining term of the Ground Lease. (Contingent Lease Agreement at § 1.)

● *The LAX Indenture and Supplemental Indenture.* The LAX Indenture and Supplemental Indenture generally provide (a) for the issuance of tax-exempt bonds by the RAIC (LAX Indenture at 1, 13–20;

LAX Supplemental Indenture at 1, 3–4), (b) for the LAX trustee to receive the proceeds of the sale of the bonds for purposes of funding construction of the RAIC Facilities (LAX Indenture at 22, LAX Supplemental Indenture at 6), and (c) for the LAX trustee to receive the rental payments from United under the LAX Leaseback (either directly from United or from RAIC within one day of RAIC's receipt of the payment from United) for the purpose of paying the debt service on the bonds and ultimately redeeming them (LAX Indenture at 31–36). The bonds issued under the Indentures are to be "payable both as to principal and interest, and premium, if any, from the Revenues to be derived by the [RAIC] from the lease[back] of the RAIC Facilities to [United] . . . and from amounts received by the [Indenture] Trustee from UAL, Inc . . . . pursuant to [the] Guaranty Agreement." (LAX Indenture at 93, LAX Supplemental Indenture at C–2.)

● *The Guaranty Agreement.* The LAX Guaranty Agreement sets out a guaranty from UAL, Inc., the parent of United (and a debtor in one of the related bankruptcy cases) to the indenture trustee of all payments due under the bonds issued pursuant to the LAX Indenture. The guaranty does not address United's obligations under the LAX leaseback.

The bonds issued pursuant to the LAX Indenture and Supplemental Indenture were redeemed by subsequent bond issues, pursuant to further supplemental indentures, for which U.S. Bank N.A. serves as indenture trustee. The later indentures incorporate the terms of the original LAX Indenture relevant to the present dispute.

*4. Denver International Airport (DEN)—Adversary Proceeding No. 03 A 00978.* At the Denver International Airport, the financing of improvements for United was accomplished by three documents: (a) a "Special Facilities and Ground Lease" (the "Denver Lease"), dated October 1, 1992, (b) an ordinance of the City of Denver, Ordinance No. 712, approved on October 14, 1992 (the "Ordinance"), and (c) a Guaranty of United, dated October 1, 1992.

· *The Denver Lease.* The Denver Lease conveys rights to United in two distinct sets of property: (1) about 45 acres of real property (described in Exhibit B to the Denver Lease), and (2) a number of "facilities," including buildings, fixtures, and personal property (set out in Exhibit A), whose purchase and construction were to be financed through bonds issued by the City of Denver. (*Id.* at 1–2, 7–8, 15–16.) United's obligations to pay rent under the lease have two components: (1) "Ground Rentals," payable monthly, based on a rate per square foot plus costs for common use services, and (2) "Facilities Rentals," payable at the times and in the amounts necessary for debt service on the bonds through which the facilities are financed. (*Id.* at 20–21.) Failure by United to make payment of either type of rent is an event of default, which may result in termination of the lease and removal of United from possession. (*Id.* at 45–47.)

● *The Ordinance.* The Ordinance provides (a) for the issuance and sale of tax exempt bonds by the City (Ordinance at 10–11; Exhibit A at A–5), (b) for a "paying agent" (now HSC Bank USA) to receive the proceeds of the sale of the bonds for purposes of funding construction of the facilities (*id.* at 15–16), and (c) for the paying agent to receive the Facilities Rentals from United under the Denver Lease for the purpose of debt service on the bonds and their ultimate redemption (*id.* at 18). The bonds issued under the Ordinance are "payable solely from the Facilities Rentals payable under the Lease

and amounts payable under the Guaranty." (*Id.* at 2, Exhibit A at A–2.)

● *The Guaranty.* The Guaranty sets out a guaranty from United to the paying agent of all payments due under the bonds issued pursuant to the Ordinance.

United and twenty-seven related corporations filed the pending Chapter 11 cases in December 2002. In March 2003, United filed the pending adversary proceedings. Each seeks a declaratory judgment that United's obligations to make payments on account of the outstanding bond issues do not arise under "leases," but rather that the documents outlined above constitute "disguised financing arrangements." In each adversary, the defendants answered and counterclaimed for a declaration that the payment obligations in question did arise under leases. The parties engaged in discovery and then filed, briefed, and argued the cross-motions for summary judgment now pending.

### Legal Discussion

Summary judgment is appropriate where the pleadings, affidavits, and other materials on file demonstrate that there exists no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c), incorporated into Fed. R. Bankr.P. 7056; *Massachusetts Bay Ins. Co. v. Vic Koenig Leasing, Inc.,* 136 F.3d 1116, 1119–20 (7th Cir.1998). There are no material facts in dispute in these proceedings.

*The significance of a "lease"in bankruptcy.* There are a variety of financial arrangements in which one party occupies real property while making payments to another party which has an interest in the property. The two most common are mortgages and leases, and in many respects they are similar. In both, the party occupying the property, the mortgagor or lessee, has an obligation to make periodic payments to the other party, the mortgagee or lessor. And in both, the consequence of a default in the required payments is a loss of occupancy rights, either through foreclosure or eviction. But in other respects, and particularly under the Bankruptcy Code, the two situations are quite different.

If a Chapter 11 debtor occupies non-residential real property as owner under a mortgage, the debtor may retain the property by paying the mortgagee no more than the current value of the property, with any additional amounts owing on the mortgage treated as an unsecured claim, pursuant to §§ 506(a) and 1129(b)(2)(A) of the Code. *In re Smith,* 287 B.R. 882, 884 (Bankr.W.D.Tex.2002). On the other hand, if the debtor does not retain the property, the mortgagee is entitled under § 506(a) of the Code to an unsecured claim for the full difference between the amounts due on the mortgage at the time of the filing and the property value.

However, if the debtor holds the property as tenant under a lease, the situation is governed by § 365 of the Code, under which the debtor may retain its occupancy and other rights only by "assuming" the lease. Lease assumption requires that the debtor cure any defaults that occurred before the bankruptcy, maintain payment obligations during the bankruptcy, and give assurance that there will be no defaults in future payment obligations. *In re Resource Technology Corp.,* 254 B.R. 215, 221 (Bankr.N.D.Ill.2000). On the other hand, if the debtor surrenders the property and rejects the lease, the landlord is entitled to an unsecured claim as limited by § 502(b)(6) of the Code, which may be less than the balance due under the lease.

In this way, the Bankruptcy Code gives greater protection to the occupancy rights of the owner of leased property than to the

occupancy rights of a lender on mortgaged property, but it gives less protection to the owner's total claim. The owner of leased property is denied repossession only if the debtor makes full payment under the lease, but the owner may receive a claim for less than the full amount due under the lease if the debtor surrenders the property; the lender on mortgaged property will be denied repossession if the debtor merely pays the lender's claim up to the value of the property, but the lender receives an unsecured claim in the full amount of any deficiency.

At the four airports involved in the pending adversary proceedings, United occupies property under agreements calling for it to make periodic payments used for debt service on tax-exempt bonds. As set out above, the agreements for each airport property are denominated "leases." United brought the pending adversary proceedings seeking a declaratory judgment that the agreements should not be treated as leases under § 365, with the potential effect of allowing United to retain its occupancy without lease assumption.

■ *The meaning of "lease" under § 365.* The term "lease" is not defined in the Bankruptcy Code. *See In re Resource Technology Corp.,* 254 B.R. at 225–26 (distinguishing between leases and other executory contracts). However, the decisions construing § 365 of the Code uniformly hold that the simple employment of the word "lease" does not bring every agreement calling itself a lease within that section. This understanding is necessary to avoid absurd results. The simplest home mortgage could be called a "lease," with the down payment called a "security deposit," the monthly payments of principal and interest called "rent," and the "tenant" provided with a title to the property after a 30–year "lease term." Rather than allowing such manipulation of terminology to control the results in bankruptcy, courts look to the economic reality underlying a questioned agreement. *Liona Corp. v. PCH Assocs. (In re PCH Assocs.),* 804 F.2d 193, 198 (2d Cir.1986) ("We interpret section 365(d)(3), (4) of the Bankruptcy Code to apply solely to a 'true' or 'bona fide' lease."); *City of San Francisco Market Corp. v. Walsh (In re Moreggia & Sons, Inc.),* 852 F.2d 1179, 1183 (9th Cir. 1988) ("[W]e have ... declined to require assumption or rejection of a purported lease that is in substance a security agreement, even where the agreement has taken on the surface formalities of a contract or unexpired lease that might otherwise come within the reach of section 365."); *City of Olathe v. KAR Dev. Assocs., L.P. (In re KAR Dev. Assocs., L.P.),* 180 B.R. 629, 636 (D.Kan.1995) ("[T]his court is persuaded that Congress intended § 365(d)(4) to apply only to 'true' or bona fide' leases ..."); *Marriott Family Restaurants, Inc. v. Lunan Family Restaurants (In re Lunan Family Restaurants),* 194 B.R. 429, 450 (Bankr.N.D.Ill.1996) ("Labeling an agreement a 'lease' does not make it one.").

This limitation of § 365 to true leases is well grounded. Before the adoption of the Bankruptcy Code in 1978, a distinction had become firmly established in the context of statutes regulating economic activity between "true" leases and financing arrangements "disguised" as leases. Since at least *Helvering v. F & R Lazarus & Co.,* 308 U.S. 252, 60 S.Ct. 209, 84 L.Ed. 226 (1939), federal tax law has treated as leases only those agreements that function as true leases in an economic sense.[5] In *Frank*

---

5. *Lazarus* allowed a taxpayer to claim a depreciation deduction on property that the taxpayer had nominally sold to a bank and leased back from the bank, upon a finding that "the transaction ... was actually a loan

*Lyon Co. v. United States,* 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978), decided while Congress was considering the legislation giving rise to the Bankruptcy Code, the Supreme Court affirmed that, for purposes of tax law, "courts are concerned with substance and realities, and formal written documents are not rigidly binding," *id.* at 573, 98 S.Ct. 1291, so that the Court would not condone "manipulation by a taxpayer through arbitrary labels and dealings that have no economic significance," *id.* at 583, 98 S.Ct. 1291. Thus, the Court ruled, a taxpayer can safely treat leases as genuine for tax purposes only if the taxpayer "retains significant and genuine attributes of the traditional lessor status." *Id.* at 584, 98 S.Ct. 1291.

Similarly, the Uniform Commercial Code ("UCC"), widely adopted during the 1960s, defined "security interest" as including financing agreements in the form of personal property leases. Section 1–201(37) of the 1958 Official Text of the UCC provided, in part:

> Unless a lease ... is intended as security, reservation of title thereunder is not a "security interest" ... Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

By the 1970s, this provision had generated considerable litigation and academic commentary, with particular emphasis on the interests of claimants in bankruptcy.

*See, e.g., Feldman v. First National City Bank (In re Leasing Consultants, Inc.),* 486 F.2d 367, 372 (2d Cir.1973) (holding, in a reclamation action against a bankruptcy trustee, that "the determination of whether the lease instruments were 'true leases' or security agreements is critical."); *DeVita Fruit Co. v. FCA Leasing Corp. (In re DeVita Fruit Co.),* 473 F.2d 585, 589 (6th Cir.1973) (holding that the question of whether a bankruptcy trustee or a putative lessor was entitled to the proceeds of an equipment sale depended on whether a true lease was involved: "When the lease is intended as a security interest, Article 9 applies.... However, a bona fide lease is not affected by Article 9."); Louis F. Del Duca, *Evolving Standards for Distinguishing a "Bona Fide Lease" from a "Lease Intended as Security"—Impact on Priorities,* 75 Com. L.J. 218 (1970); William B. Davenport & Daniel R. Murray, *Secured Transactions* § 2.04(a) (1978):

> [A] considerable number of agreements called leases are really disguised conditional sales and will be held to be such if they are questioned in appropriate litigation....
>
> ....
>
> Under the 1962 Text of Article 9, it is important to determine whether the transaction is one intended as security because filing is required to perfect the security interest of the lessor-secured party. In the absence of proper filing, the unperfected security interest will be subordinate to ... the rights of lien creditors (including a trustee in bankruptcy)....

With these principles of economic regulation well established, it is highly likely that in creating special treatment for "leases" in § 365 of the Bankruptcy Code, Congress intended to include only econom-

secured by the property involved." 308 U.S. at 255, 60 S.Ct. 209.

ically "true" leases—and the legislative history confirms this. In discussing the language now found at § 502(b)(6), limiting damages resulting from rejection of a lease under § 365, the Senate Report restricts the Code's "lease" treatment to true leases and incorporates the concepts underlying the UCC's definition of "security interest":

> [T]he phrase 'lease of real property' applies only to a 'true' or 'bona fide' lease and does not apply to financing leases of real property or interests therein, or to leases of such property which are intended as security.
>
> [I]n a true lease of real property, the lessor retains all risk and benefits as to the value of the real estate at the termination of the lease . . .
>
> Whether a "lease" is [a] true or bona fide lease or, in the alternative, a financing "lease" or a lease intended as security, depends upon the circumstances of each case. The distinction between a true lease and a financing transaction is based upon the economic substance of the transaction and not, for example, upon the locus of title, the form of the transaction, or the fact that the transaction is denominated as a "lease". The

fact that the lessee, upon compliance with the terms of the lease, becomes or has the option to become the owner of the leased property for no additional consideration or for nominal consideration indicates that the transaction is a financing lease or lease intended as security. In such cases, the lessor has no substantial interest in the leased property at the expiration of the lease term. In addition, the fact that the lessee assumes and discharges substantially all the risks and obligations ordinarily attributed to the outright ownership of the property is more indicative of a financing transaction than of a true lease. The rental payments in such cases are in substance payments of principal and interest either on a loan secured by the leased real property or on the purchase of the leased real property.

S.Rep. No. 989, 95th Cong., 2d Sess. 64 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5850.

 Thus, just as the term is understood in federal tax law and under the UCC, "lease" in § 365 of the Bankruptcy Code means "true lease." [6]

**6.** Some cases suggest that state law determines the kind of real estate "lease" that is subject to assumption or rejection under § 365. *See, e.g., Martin Bros. Toolmakers, Inc. v. Industrial Dev. Bd. (In re Martin Bros. Toolmakers, Inc.),* 796 F.2d 1435, 1440 (11th Cir.1986) (citing Alabama law in determining "not to pursue a bankruptcy law analysis" of whether a true lease was involved); *Fox v. Peck Iron & Metal Co.,* 25 B.R. 674, 688–90 (Bankr.S.D.Cal.1982) (relying on California law to determine that a sale/leaseback did not involve a true lease). It has been argued that Congress intended state law to control, based on the legislative history of the definition of "security interest" (now in § 101(51) of the Code): "A security interest is . . . a lien created by an agreement . . . Whether a . . . lease constitutes a security interest under the bankruptcy code will depend on whether it constitutes a security interest under applicable

State or local law." S.Rep. No. 989, 2d Sess. 26 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5812. This statement, however, does not contradict those portions of the same report indicating that §§ 365 and 502(b)(6) apply only to true leases. Compliance with local law is necessary to create the lien that gives rise to any security interest. As a result, to be considered a security interest under the Bankruptcy Code, a lease must constitute a lien under local law. It is certainly possible for a given agreement to fall outside the coverage of § 365, because it is not a true lease, and also fail to confer a "security interest" because the requirements of local law for creation of a lien have not been satisfied. Because the Bankruptcy Code itself uses "lease" in § 365 to mean a true lease, state law should not be used to reach a contrary result. *See Perez v. Campbell,* 402 U.S. 637, 652–53, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971) (holding

■ *The standards for determining a true lease.* According to the language of the Senate Report on the Bankruptcy Code, and consistent with the legal standards developed under the UCC and federal tax law, a "lease" under § 365 of the Bankruptcy Code requires that the lessor retain significant "risk and benefits as to the value of the [putatively leased] real estate at the termination of the lease." The Supreme Court emphasized risk to the lessor, including "all building depreciation risks," in finding a true lease for tax purposes in *Frank Lyon Co.*, 435 U.S. at 582–83, 98 S.Ct. 1291. And the need for a true lessor to retain risk at lease termination is reflected in the UCC's prescription that a true lease does not exist where "upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration." In such a situation, the lessee has effectively purchased the property through the mechanism of the lease, and so the lessee, not the lessor, has the benefit or burden of changes in the value of the property when the lease terminates. Similarly, if the lease lasts for the economic life of the property being leased, the lessee, not the lessor, bears the risk of changes in value. This is because the lessee will be paying a fixed amount to the lessor for whatever value the property has during its economic life, with the lessor having no risk other than nonpayment (the same risk that any secured lender bears).[7]

■ Beyond this central issue—how a questioned lease allocates ownership risk—courts determining the status of a lease for purposes of § 365 have considered a variety of factors ordinarily associated with ownership rather than lessor status. The most frequently cited list is in *Hotel Syracuse, Inc. v. City of Syracuse Indus. Dev. Agency (In re Hotel Syracuse, Inc.)*, 155 B.R. 824, 838 (Bankr.N.D.N.Y. 1993), *citing PCH Assocs.*, 804 F.2d at 200–01:

(i) whether the "rental" payments were calculated to compensate the lessor for the use of the land, or rather were structured for some other purpose, such as to ensure a particular return on an investment;

(ii) whether the [lessor's] purchase price was related to the fair market value of the land, or whether it was calculated as the amount necessary to finance the transaction;

(iii) whether the property was purchased by the lessor specifically for the lessee's use;

(iv) whether the transaction was structured as a lease to secure certain tax advantages;

(v) whether the lessee assumed many of the obligations normally associated with outright ownership, including the responsibility for paying property taxes and insurance.

In applying the standards for determination of a true lease to the leases in

in a bankruptcy context that "any state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause").

7. The UCC definition of "security interest" was amended to state expressly that a transaction denominated a lease is a financing agreement (rather than a true lease) "if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee; and ... the original term of the lease is equal to or greater than the remaining economic life of the goods." UCC § 1–201(37)(b) (1987). The current version of Article 1 the UCC sets out the same definition in § 1–203(b)(1) (2001).

question here, it is helpful to divide the leases into two categories: in the first category are the three leases (SFO, JFK, and LAX) involved in lease/leaseback transactions: in the second category is the single lease (DEN) not involved in such a lease/leaseback.

■ *The lease/leaseback transactions: financing arrangements.* The transactions described above involving San Francisco, JFK, and Los Angeles International Airports all have a common feature: a bond-issuing agency received an interest in a leasehold held by United and leased that interest back to United in exchange for rent equaling the debt service and administrative costs associated with bonds issued by the agency, with a lease term ending with final payment of the bonds. United is correct in contending that these leaseback transactions are not true leases subject to assumption or rejection under § 365, as is apparent from three distinct considerations.

■ First, and most important, the status of the three leasebacks is governed by the principle that there cannot be a true lease where the lessor has no ownership interest at the end of the lease term. Here, the bond-issuing agencies have no such ownership interest because the property interest they are leasing to United is itself a leasehold that terminates at the end of the term of the leaseback. In each of the leaseback arrangements, United transferred to the agency (either by sublease or assignment) a leasehold interest in airport property that United held under a ground lease from the operator of the airport, and in the leasebacks the agencies transferred the identical interest to Unit-

ed. Each of the leaseback arrangements has the following defining features:

- United has no right to terminate the leaseback before the redemption of the bonds issued by the agency for United's benefit;

- the leasehold interest transferred from United and the leaseback of that interest to United both have the same term, coinciding with the redemption of bonds; and

- the rent payable by United exactly equals the debt service and administrative expenses connected to the bond issues.

Thus, unlike a true lease—where the leased property reverts to the lessor at the end of the lease term with substantial value remaining, as to which the lessor takes the ownership risk—the leasebacks terminate with no property interest reverting to the bond-issuing agencies.[8] Since the leasehold that is the subject of each leaseback expires during the term of the leaseback, its entire economic value is exhausted during the leaseback, and nothing reverts to the agencies.

The agencies, trustees, and airport operators dispute this, observing that the airport property involved in United's ground leases retains value after the termination of the leasebacks. Though accurate, this observation does not affect the ownership analysis. The airport property itself was not leased back; only a leasehold interest in that property was, and that leasehold does not survive the end of the term of the leasebacks. The absence of a surviving ownership interest dictates a determina-

---

**8.** Of course, if the leaseback terminated prematurely because of a default by United, the agency might assert an interest in the leasehold, but this sort of interest—active only on default—is a hallmark of secured financing, not true leasing. The test for a true lease is the interest reverting to the lessor, in the absence of default, at the end of the stated term of the lease.

tion that the leasebacks are not true leases.

Second, the *Syracuse Hotel* factors, to the extent that each is relevant, confirm this determination.

(i) The rental payments from United under the leasebacks were not calculated to compensate the agencies for the use of the transferred leasehold, but were defined by the amounts needed to pay the bonds. It may be that the periodic payments on the bonds required under the leasebacks approximated the fair rental value of the property interests conveyed by the leasebacks, but the bond payments—not the use values of the property—were controlling. This is evident from the result under the leasebacks in situations where the value of the leasehold is reduced: (1) if United makes sufficient payments to redeem the bonds early, the leasebacks terminate immediately, with no reduction in rental payments by United corresponding to the shorter lease term; and (2) if a portion of the property involved in the leasebacks is lost through condemnation, there is again no diminution of the leaseback rent.[9]

(ii) The agencies did not acquire the interests that they leased back to United for market value. Rather, they paid nominal (if any) consideration to United, and the real consideration for the leaseholds transferred by United was the promise by the agencies to issue bonds on United's behalf.

(iii) The property interest involved in the leasebacks (the leasehold interest under the ground leases) was acquired by the agencies specifically for United's use.

(iv) The leases were part of an arrangement structured to obtain tax advantages (although tax exempt bonds might have been issued without leasebacks, as was done in the situation of the Denver International Airport).

(v) The lessee (United) had all of the ordinary obligations associated with ownership, including the need to maintain insurance and pay property taxes.

Finally, the leaseback transactions at issue here are the economic equivalent of leasehold mortgages, a recognized real estate financing mechanism—again supporting the conclusion that the leasebacks are financing arrangements. *See* Grant S. Nelson & Dale A. Whitman, *Real Estate Finance Law* § 15.14 (4th ed.2002).[10] In a typical leasehold mortgage, a lender receives a lien on the debtor's leasehold interest, and in the event of default on the loan, the lender may terminate the debtor's rights in the mortgaged lease. Then, the lender may either occupy the real estate or re-lease it to another party. The leasebacks here have the same effect: United, as the "owner" of the leasehold created by its ground leases, effectively mortgaged a portion of its leasehold interest as security for the bond payments. As long as United pays the "rent" equaling debt service on the bonds, it retains its full rights under ground leases. If it repays

---

**9.** SFO Leaseback at 5, LAX Leaseback at 5–6, and JFK Leaseback at 25.

**10.** "A leasehold mortgage is a security interest in the lessee's rights and interests under a ground lease, including the lessee's leasehold estate in the leased premises. A leasehold mortgage ordinarily also encumbers any buildings and other improvements not included in the leased premises, but owned by the lessee. Although the typical leasehold mortgage secures a lessee-borrower's obligation to repay a loan, a leasehold mortgage may be given as security for the performance of any obligation capable of being secured by a mortgage or security interest under applicable state law." Richard F. Casher et al., *Leasehold Mortgages in Bankruptcy: Look Before You Leasehold,* 402 PLI/Real 689, 697 (1993).

the bonds in full, the lease/leaseback ends, and the agencies have no further claim on the leasehold. But if United defaults, the agencies may accelerate the rental payments and (as to two of the leasebacks) terminate United's possession and relet the property.[11]

Indeed, lease/leaseback arrangements have been recommended as a financing alternative to leasehold mortgages, with the pointed caveat that "[b]ankruptcy courts tend to focus on the economic substance of a transaction and not the nomenclature that the parties to the deal have used" so that a court may "recharacterize the lease/leaseback transaction as a secured loan rather than an operating lease." See Kathi W. Borkholder, Ground Leases–Lease/Leaseback Financing Alternatives to Mortgages, 13–FEB Prob. & Prop. 37, 41 (1999). In what appears to be the only reported opinion considering the question, Scottsdale Assocs., Inc. v. Seatrain Lines, Inc. (In re Seatrain Lines, Inc.), 20 B.R. 577, 582 (Bankr.S.D.N.Y.1982), the court recharacterized a lease/leaseback arrangement as a form of mortgage. Recharacterization is similarly required here; United has overcome the presumption that the terminology used by the parties accurately reflected the economic substance of their agreements. See In re PCH Assocs., 804 F.2d at 200 (recognizing presumption and finding that it was overcome).[12]

■ Other arguments of the leaseback defendants. Two arguments remain to be considered in connection with the leasebacks. First, the LAX trustee argues that the court must consider the LAX Leaseback together with the LAX Ground Lease in determining its status as a true lease under § 365. In other words, the LAX trustee asserts that the two documents should be integrated into a single agreement. Since no provision of the Bankruptcy Code deals with the integration of agreements, this is an issue to be determined under applicable nonbankruptcy law, here the law of California. Moore v. Pollock (In re Pollock), 139 B.R. 938, 940 (9th Cir. BAP 1992). The factors relevant to that determination are: "(1) [w]hether the nature and purpose of the obligations are different; (2) whether the consideration for the obligations is separate and distinct; and (3) whether obligations of the parties are interrelated." Id., at 940–41 (citing In re Gardinier, 831 F.2d 974, 976 (11th Cir.1987)).

These factors establish that the LAX Leaseback is not integral to the LAX Ground Lease. First, the purposes of the two agreements are different. The ground lease (LAX Ground Lease § 3, pp. 3–12) involves United's overall airport operations, covering a wide range of necessary facilities. Although it contemplates RAIC bonding, it also provides for financing from other sources (id. at § 4A, p. 12) and so is independent of any financing that RAIC might effectuate. The leaseback, on the other hand, covers only the facilities affected by the RAIC bond financing, and is intended to support repayment of the bonds. Second, the consideration for the two agreements is separate, with rent under the ground lease (id. at § 6, pp. 16–25) in no way connected to the leaseback rent, which is defined by the debt service on the bonds. And third, the obligations of the parties are distinct: United has separate

---

11. The SFO and LAX Leasebacks, and SFO and LAX Indentures provide for this remedy. (SFO Leaseback at 15–17, SFO Indenture at 40–41, LAX Leaseback at 21, and LAX Indenture at 54–55.) The JFK Leaseback does not. (JFK Leaseback at 40–42.)

12. However, no finding is made as to whether the leasebacks have met the requirements of local law for an enforceable leasehold mortgage.

payment obligations under the ground lease and leaseback; the City of Los Angeles has traditional duties of a lessor under the ground lease; and RAIC has no significant duties under the leaseback. The rest of the leaseback defendants have conceded that their agreements respecting United's bond financing are not subject to integration with the ground leases.

■ The other argument that various defendants advance is a quasi-estoppel claim—that because United treated the leasebacks as leases for purposes of accounting and for obtaining financing and tax benefits, United should not now be allowed to deny that the leasebacks are true leases under § 365 of the Bankruptcy Code. To some extent, these arguments are grounded in *Martin Bros. Toolmakers*, 796 F.2d at 1440, which employs state law to determine the status of a lease under § 365. As discussed above, this view is not adopted here. Furthermore, to the extent that the defendants are asserting a claim of equitable estoppel, it has no basis: they have pointed to no false statement of fact by United that they have relied on to their detriment. *See Hotel Syracuse*, 155 B.R. at 836 (discussing the elements of estoppel in connection with a determination of lease status under § 365). To refer to the leasebacks as leases is no misstatement, since that is their form, and the tax and accounting treatment properly accorded to the leasebacks presents issues separate from the bankruptcy question involved here.[13] And regardless of the appropriateness of United's tax and accounting treatment of the leasebacks, these issues do not present factual matters on which the defendants could reasonably have relied. The defendants, all represented by counsel in connection with the negotiation of these complex agreements, were responsible for drawing their own conclusions about the legal impact of the leasebacks in bankruptcy.

*The Denver Lease: a true lease.* The Denver Lease is substantially different from the leasebacks discussed above. Unlike the bond-issuing agencies who were the nominal lessors in the leasebacks, the City of Denver unquestionably occupies a traditional lessor's position under the Denver Lease. It owns the leased property, and at the conclusion of the lease term it will receive the return of the property, with a substantial part of its economic life remaining. The City bears a genuine risk of changes in the property value at the end of the lease term. Recognizing that the lease, taken as a whole, is a true lease subject to assumption or rejection under § 365, United has argued that the lease should be severed into two agreements: one (a true lease) governing its use of the airport real estate and another (a financing arrangement) providing for its repayment of bonds issued by the City.

■ Like the question of contract integration discussed above, the question of contract severability must be determined under applicable nonbankruptcy law, since the Bankruptcy Code does not address the issue. *In re Cafeteria Operators, L.P.*, 299 B.R. 384, 389 (Bankr. N.D.Tex.2003) (collecting authorities). By its terms, the Denver Lease is to be inter-

---

13. The Supreme Court recognized in *Frank Lyon* that the treatment of an agreement for purposes of tax law might be different from its treatment in other contexts: "[W]e are mindful that the characterization of a transaction for financial accounting purposes, on the one hand, and for tax purposes, on the other, need not necessarily be the same." 435 U.S. at 577, 98 S.Ct. 1291; *accord Thor Power Tool Co. v. C.I. R.*, 439 U.S. 522, 541, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979). Similarly, the treatment of a lease may be different under § 365 than in non-bankruptcy contexts.

preted according to the law of Colorado. (Denver Lease § 12.11, p. 53.) A recent decision of the Colorado Supreme Court applies Colorado's rule for contract severability. In *Univex Int'l, Inc. v. Orix Credit Alliance, Inc.*, 914 P.2d 1355 (Colo.1996), the court dealt with a claim by a would-be purchaser of equipment under an oral contract to be financed by the seller. The purchaser sought application of a liberal statute of frauds under Article 2 of the Uniform Commercial Code, rather than the more stringent statute of frauds governing financing agreements, on the ground that there were two separate contracts involved: one for the sale of goods, the other for financing. The court rejected this argument, holding that "under Colorado law, a contract cannot be severed unless the language of the contract manifests each party's intent to treat the contract as divisible." *Id.* at 1357.

■ Nothing in the Denver Lease manifests an intent either by the City of Denver or by United to treat the lease as divisible into separate ground lease and financing components. United's principal argument in favor of severability is that its payment of the "Facilities Rentals" (the payments on account of the bonds issued by the City) is to be made to the paying agent for the bondholders rather than to the City. (Denver Lease, § 6.1, p. 20.) This, however, is no indication that the parties considered that payment obligation severable from the rest of the lease. To the contrary, the lease provides that United's payments to the paying agent are "for the account of" the City (*id.* § 6.1(a), p. 20), and the lease treats a failure by United to make "Facilities Rentals" (bond) pay-

ments (*id.* § 11.1(a), p. 45) as an event of default equivalent to a failure to make any other payment required under the lease (*id.* § 11.1(b)). The City's major remedies on default draw no distinction between the various payment obligations. (*Id.*, § 11.2(a), (c), and (d), pp. 46–48.) In the absence of an indication of the parties' intent that the lease be severable, Colorado law requires that it be treated as an integrated, single agreement.[14] And because the Denver Lease, taken as a whole, is a true lease for purposes of § 365, it is not necessary to address the arguments of the parties as to whether the financing aspects of the lease, considered separately, would have that status.

### Conclusion

For the reasons set out above, in Adversary Proceeding Nos. 03 A 00975, 03 A00976, and 03 A 00977, United's motions for summary judgement are granted and the defendants' motions for summary judgment are denied. In Adversary Proceeding No. 03 A 00978, the defendants' motion for summary judgment is granted and United's motion for summary judgment is denied. Separate orders will be entered to that effect.

---

14. In determining severability for purposes of assumption or rejection under § 365, a bankruptcy court applying the law of the District of Columbia came to a similar conclusion, holding that a lease incorporating financing by the lessor could not be divided into separate lease and financing contracts. *In re Cafe Partners/Washington 1983*, 90 B.R. 1 (Bankr. D.D.C.1988).